UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

|  |  |
|---|---|
| LESTER WILLIAMS,<br>PESONAL REPRESENTITIVE OF THE<br>ESTATE OF COBURN BENSON<br>STATE OF MAINE PENDING<br>PROBATE ACTION<br>    PLAINTIFFS<br><br>v.<br><br>DRAGONE CLASSIC MOTOR CARS,<br>EMANUEL G. DRAGONE IN<br>HIS CAPACITY AS AGENT OR<br>OFFICER<br>AND<br>GEORGE DRAGONE,<br><br>    DEFENDANTS | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Docket no.: 2:20-cv-00115-GZS |

## PLAINTIFFS' OBJECTION TO DEFENDANTS' MOTION TO DISMISS WITH INCORPORATED MEMORANDUM OF LAW

NOW COMES the Plaintiff, The Estate of Coburn Benson and Lester Williams as personal representative of the Estate of Coburn Benson, and objects to the Defendants' Motion to Dismiss for (1) lack of personal jurisdiction pursuant to Rule 12(b((2); (2) for improper venue pursuant to Rule 12(b)(3); and/or (3) for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal rules of Civil Procedures.

1

## Procedural History

The Plaintiffs filed the present action on or about March 26, 2020. On August 7, 2020, the Defendants moved for more definitive statement. The Plaintiffs thereafter agreed to revise the complaint to address the Defendants' concerns. On October 13, 2020, Plaintiffs filed the First Amended Complaint, which is subject of the present motion.

## Personal Jurisdiction

Defendants' contention that Plaintiff's 1st Amended Complaint fails to allege "any" facts that would support the Court's personal Jurisdiction over "any" of the Defendants is both incorrect and misleading. The Defendants, however, are correct in their assertation that the Plaintiff bears the burden of proof pertaining to jurisdiction as to the forum of state when jurisdiction is contested. Sawtelle v Farrell, 70 F.3d 1381, 1387 (1st Cir. 1995). "To establish personal jurisdiction in a diversity case, a Plaintiff must satisfy both the forum state's long arm statute and the Due Process Clause of the Fourteenth Amendment." C.W. Downer v. Bioriginal Food & Sci. Corp., 771 F.3d 59, 65 (1st Cir. 2014). "Because the Law Court has deemed Maine's long-arm statute coextensive with permissible exercise of personal jurisdiction under the Due Process Clause… the due process inquiry controls in the present case." Lucerne Farms v Baling Techs., Inc., 226 F. Supp. 2d 255, 257 (D. Me. 2002). "[The plaintiff] must put forward evidence of specific facts to demonstrate that jurisdiction exists." A Corp. v All Am. Plumbing, Inc., 812 F.3d 54, 58 (1st Cir. 2016) (internal citations and quotations omitted). In assessing this showing, the court must accept "properly documented" proffers as true and "construe them in the light most congenial" to the Plaintiff. Daynard v Ness, Motley, Loadholt, Richardson & Poole. P.A., 290 F.3d 42, 51 (1st Cir. 2002) (internal citation and quotations omitted).

Defendants overlook that attached to the Plaintiff's 1st Amended Complaint (Complaint) is the original contract which is the original agreement that forms the basis for this entire dispute. The contract indicates, and the Defendants acknowledge, that the Plaintiff, Coburn Benson, or now the Estate of Coburn Benson (Estate), is a Maine resident by listing his Maine address in the section of the contract where the relevant information and address of the purchaser of the contract is located. This information is indicative of Dragone's knowledge that they were doing business with a resident of the State of Maine. (see attached exhibit A) The significance of the contract itself is such that the Court may utilize the information contained within the four corners of the document to determine the Plaintiff's evidence presented in the Plaintiff's 1st Amended Complaint pertaining to Jurisdiction. The contract itself is offered as an exhibit and can be read alone or in conjunction with the other allegations in the Complaint (see Daynard v. Ness, 290 F.3d 42 (1st Cir. 2002). In order to make a determination of jurisdiction "the Court employs the prima facie evidence standard as it is the "most conventional" and is "a useful means of screening out cases in which personal jurisdiction is obviously lacking." *Id.; see also Astro-Med,* 591 F.3d at 8

Clearly, George Dragone, who was the agent of Dragone Motor Cars executing the contract, saw that Coburn Benson was indeed a resident of in Maine and that Dragone was doing business with a citizen of the State of Maine. Additionally, and most interestingly, the sales tax portion of the contract contains no amount and there is a handwritten notation "out of state" written where the sales tax portion of the contract should contain a dollar figure. Not only does this notation acknowledge that Dragone is entering into a transaction with a person from the State of Maine but also that Dragone is availing itself to the laws of the State of Maine in order to avoid paying Connecticut sales tax. (see exhibit A) This situation can clearly be construed as

3

an acknowledgment by Dragone that this transaction is one that is being conducted with a Maine citizen, for which he can foresee the possibility of an action being brought against him by that Maine resident, in Maine. By this writing Dragone avoids or attempts to avoid a sizeable sales tax payment in the State of Connecticut by choosing the transaction's location to be in the State of Maine.

Additional information regarding Dragone's Personal Jurisdiction and Dragone's contacts with the State of Maine are contained in email by Defense counsel to Plaintiff's counsel where Defense counsel admits to other unrelated classic car transactions occurring between Dragone and Coburn Benson. Regarding these transactions Defendants state, "of which there were several between them during that early 2000's." (see exhibit C bullet point 5) In that same email Defense counsel purports attempted phone call communications to Benson and received phone calls from Lester Williams. (see exhibit C) Defendant Dragone also admits a reciprocal relationship with Coburn Benson spanning over 11 years. (see exhibit C) Dragone Classic Motor Cars has an International website on which they advertise that they are a national company and that "Today, our mission at Dragone Classic Motorcars is as it has always been, to not only find, restore and provide the collector car world with the greatest cars, but to also educate people about these cars and their history to keep the car hobby alive. We give a personal one on one experience with both buyers and sellers that is unmatched by anyone else and continue to enjoy meeting and building relationships with collectors, car enthusiast's and specialists all over the world and will do so for many years to come." (see exhibit B) After a person accesses the Dragone website and subscribes to Dragone's newsletter, Dragone directly emails those individuals with solicitations, one such direct solicitation was received by the prior attorney in this case on December 4, 2020. (see exhibit D)

Plaintiff agrees with Defendants as to the legal analysis for the determination of personal jurisdiction, as stated by the Defendant. "When general jurisdiction is lacking, the lens of judicial inquiry narrows to focus on specific jurisdiction... [which] requires weighing the legal sufficiency of a specific set of interactions as a basis for personal jurisdiction. " Foster-Miller, Inc. v. Babcock Wilcox Canada, 46 F.3d 138, 144 (1st Cir. 1995). The existence of specific personal jurisdiction depends upon the Plaintiff's ability to satisfy two foundational conditions: "first, that the forum in which the federal district court sits has a long-arm statute that purports to grant jurisdiction over the Defendant; and second, that the exercise of jurisdiction pursuant to that statute comports with the strictures of the Constitution." Pritzker v. Yari, 42 F.3d 53, 60 (1st Cir. 1994); *see also* Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 204 (1st Cir. 1994); Hahn v. Vermont Law Sch., 698 F.2d 48, 51 (1st Cir. 1983). In order to establish specific personal jurisdiction, plaintiffs "must show that: (1) their claim directly arises out of or relates to the Defendant's forum-state activities; (2) the Defendant's contacts with the forum state represent a purposeful availment of the privilege of conducting activities in that state . . . ; and (3) the exercise of jurisdiction is ultimately reasonable." Scottsdale Capital Advisors Corp. v. The Deal, LLC, 887 F.3d 17, 20 (1st Cir. 2018). In cases such as the present one , where there are multiple defendants, "[e]ach defendant's contacts with the forum State must be assessed individually." Calder v. Jones, 465 U.S. 783, 790 (1984).

The First Circuit has divided the specific jurisdiction and subsequent minimum contacts analysis into three inquires: (1) relatedness; (2) purposeful availment; and (3) reasonableness. *See N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale,* 567 F.3d 8, 16 (1st Cir.2009) ("[A]llowing jurisdiction to be asserted as to a specific claim, can be

5

established where the defendants availed themselves of the opportunity to do business in the state, the claim in question is related to that access and the so-called gestalt factors are consistent with requiring an out-of-state defendant to defend within the state.").

"[R]elatedness is the divining rod that separates specific jurisdiction cases from general jurisdiction cases.... [I]t ensures that the element of causation remains in the forefront of the due process investigation." *Nowak v. Tak How Invs., Ltd.,* 94 F.3d 708, 714 (1st Cir.1996) (citing *Ticketmaster-New York, Inc. v. Alioto,* 26 F.3d 201, 206 (1st Cir.1994)). The relatedness inquiry asks whether "the claim underlying the litigation directly arises out of, or relates to, the defendant's forum-state activities." *Astro-Med,* 591 F.3d at 9 (quoting *N. Laminate Sales,* 403 F.3d at 25). It is a "flexible, relaxed standard." *N. Laminate Sales,* 403 F.3d at 25.

The fact that the Defendants' Maine-based contacts occurred remotely, primarily through fax and telephone conversations, is not at all fatal to a finding of jurisdiction. The First Circuit explained that "forum-state contacts need not involve physical presence," *Phillips Exeter Acad. v. Howard Phillips Fund, Inc.,* 196 F.3d 284, 290 (1st Cir.1999), and "[t]he transmission of information into [the forum state] by way of telephone ... or mail is unquestionably a contact for purposes of [the jurisdiction] analysis." *Sawtelle v. Farrell,* 70 F.3d 1381, 1389-90 (1st Cir. 1995).[7]

The Defendants' relevant conduct related to State of Maine activities were purported mailings to Coburn Benson regarding the contractional events pertaining to the restoration, purported phone calls to Coburn Benson, Benson and William's calls from Maine, other ongoing classic car transactions Dragone engaged in with Coburn Benson, and other past transactions with Coburn Benson spanning an admitted 11-year period. (see exhibit D) Currently Dragone is engaged in the internet sale of products and services to the entire population of the citizens of the

State of Maine through direct email subscription and direct solicitation, through advertisement in national and international publications and periodicals, in in email and social media postings and solicitations about its international and national reach and scope..

Defendants make their arguments based upon their adversarial reading of Plaintiff's 1st Amended Complaint. However, it should be noted that none of the facts as contained in Plaintiff's First Amended complaint are denied or contradicted by the Defendants. As to the original contract in this matter there is no dispute that it existed as written, executed and attached to Plaintiff's 1st Amended complaint and now to this Objection. (see exhibit C) The information contained within the document itself is evidence of Dragone's conscious intention to do business with Coburn Benson and all residents of the State of Maine. Admittedly, via email, Dragone counsel admits Dragone's attempts to contact the Plaintiff while he was in Maine in order to modify or collect fees it alleges are based on the contract and phone contact with Lester Williams as well as a multitude of events spanning 20 years (see exhibit B)

Secondly, the information contained in the contract indicates an intention by Dragone to claim protection of an interstate sale to a Maine resident. Dragone does this to  avoid the obligations of paying sales tax in Connecticut indicating that the transaction was conducted in or to a resident in the State of Maine. This acknowledgement constitutes foreseeability on the part of Dragone that they may be subject to the jurisdiction of the courts of Maine. Additionally, the complaint itself alleges that Coburn Benson's Probate estate is docketed and exists in York, ME. The existence of the estate creates a substantial interest by the State Court that the assets of the estate be collected and maximized. Additionally, Maine's Long Arm Statute (14 M.R.S.A. section704-A) states;

"1. Declaration of purpose. It is declared, as a matter of legislative determination, that the public interest demands that the State provide its citizens with an effective means of redress against nonresident persons who, through certain significant minimal contacts with this State, incur obligations to citizens entitled to the state's protection. This legislative action is deemed necessary because of technological progress which has substantially increased the flow of commerce between the several states resulting in increased interaction between persons of this State and persons of other states.

This section, to ensure maximum protection to citizens of this State, shall be applied so as to assert jurisdiction over nonresident defendants to the fullest extent permitted by the due process clause of the United States Constitution, 14th amendment.

2. Causes of action. Any person, whether or not a citizen or resident of this State, who in person or through an agent does any of the acts hereinafter enumerated in this section, thereby submits such person, and, if an individual, his personal representative, to the jurisdiction of the courts of this State as to any cause of action arising from the doing of any of such acts:

A. The transaction of any business within this State;

B. Doing or causing a tortious act to be done, or causing the consequences of a tortious act to occur within this State;

[ ] and

I. Maintain any other relation to the State or to persons or property which affords a basis for the exercise of jurisdiction by the courts of this State consistent with the Constitution of the United States."

The Plaintiff has established that even the Defendant indicated this was an Out of State Sale to a Maine resident, and the Plaintiff has plead a tort claim or consequence in the 1st amended complaint (Count II CONVERSION).  Additionally, Maine has a public policy interest in protecting its citizens from fraudulent businesses or scammers, especially its elderly citizens. Plaintiff has plead a Fraud Count as well.

It can be argued that given the extent of all reliably proffered evidence and solicitation by Dragone in the State of Maine that general jurisdiction exists. Also, in support, there is substantial evidence that Dragone engages in systematic activities unrelated to this case in Maine. General Jurisdiction can be found in this case based on the totality of Dragone's involvement regarding their business contacts and transactions in the State of Maine. Additionally, Dragone's presence on the internet is such that individuals in Maine are solicited

directly. As for establishing Dragone's minimum contacts with Maine, one Maine state court has interpreted Maine's long-arm statute to create jurisdiction over internet-based transactions. The Maine Superior Court in *Montalvo v. First Interstate Fin. Corp.*, 2005 WL 380727, at *3 (Me.Super.Ct. Jan. 3, 2005) responded to a defendant's argument that Maine jurisdiction would be unfair where "its Internet solicitations were directed broadly, that is, nationally and internationally, but were not `purposefully' directed at Maine." The Court held that "Internet advertising and sales are an example of precisely the sort of technological progress' creating an increased flow of commerce between Mainers and sellers in other states that was expressly the purpose of Maine's long arm statute. 14 M.R.S.A. § 704-A(1) (2003). A business cannot escape liability for fraudulent [or tortious] transactions with Maine consumers simply by conducting its business online." *Id.*

In Murphy v. Keenan, 667 A.2d 591, 593 (Me. 1995) the Law Court determined that the plaintiff bears the burden of establishing the first two prongs of this three-part legal standard. (Id. at 594.) Where, evidence regarding jurisdiction is included in the record, the plaintiff's showing must be based on specific facts set forth in the record. Id. The record is construed in a light most favorable to the plaintiff. Id. If the plaintiff meets these first two prongs, the burden then shifts to the defendant, who, in order to prevail, must establish that jurisdiction is improper because it does not comport with "traditional notions of fair play and substantial justice." Id.

### Venue

Defendants argue that Plaintiff's 1st Amended Complaint should be dismissed for improper venue. Defendants' argument, for the most part, is that the alleged acts in Plaintiff's complaint are not identified as to where they took place. Again, Defendants completely ignore the existence of the original contract and evidentiary value of the fact that the contract directly

states that the transaction occurred in the State of Maine with a Maine resident and that Connecticut sales tax portion it specifically states that this is an "out of state" transaction. (see exhibit A) The contract speaks for itself on these facts. The existence of the original contract has never been challenged by the Defendants nor has the information contained within the four corners of the contract. Likewise, on the contrary, Defendants admit to its existence (see exhibit C). Additionally, the Defendants do not challenge any of the allegations in the Plaintiff's 1st Amended Complaint and Plaintiff is now able to proffer the admissions of the Defendant. (see exhibit C). Finally, the Defendant's fail to acknowledge that the Plaintiff has plead a tort violation that either occurred in Maine, or its consequences did, and it definitely happened to a Maine resident, a fact that they were well aware of and capitalized on when entering into the contract.

The Defendants simply make allegations that the Complaint is void of information as to the events that occur in Maine. However, the Defendants do not deny that they failed to deliver an antique automobile to the Plaintiff a Maine resident, who paid the Defendants 1.7 million dollars under the terms previously stated. Included in the sale were the original parts of the automobile that still exist and the plans for the automobile, which, along with the restored automobile, have never been delivered, nor was notice of its completion ever given to the Plaintiff, in writing. (see exhibit A). Defendants knew that they contracted with the Plaintiff who resided in the State of Maine and with whom the Defendants admittedly had a business relationship with for over a decade which involved multiple transactions. Additionally, the Defendants fail to mention that the Federal Venue Statute, 28 U.S. Code 1391 (b)(3) allows venue to be proper in "any judicial district in which any defendant is subject to the court's personal jurisdiction within respect to such action." Defendants fail to

address sections 1391 (b)(2) and 1391 (b)(3) of 28 U.S. Code 1391. In their argument for Lack of Venue.

In Henderson v Laser Spine Inst. 815 F. Supp. 2d 353, 2011 This Court held, pertaining to 28 U.S. code 1391(b)(2), that a substantial part of the events or omissions giving rise to the claims was satisfied by years of contact with the Defendants prior to his filing a lawsuit and determined that this was sufficient contact with Maine even if some of the allegations (or most, for that matter, in that case the surgery itself was performed out of state on a Maine resident) occurred elsewhere. As it pertains to 28 U.S. Code 1391(b)(3) the Plaintiff reincorporates his argument made pertaining to personal jurisdiction. 28 U.S. 1391 (b)(3) states that venue is proper where, "any Defendant is subject to the court's personal jurisdiction with respect to such action."

## Failure to State a Claim Upon Which Relief Can Be Granted

Defendants argue that the Plaintiff's 1st Amended Complaint should be dismissed in its entirety due to a failure on the part of the Plaintiff to plead with particularity as to the liability by each Defendant separately. However, the Defendants are silent as to which Defendant they are referring to. Instead, the Defendants attempt to group all the Pleadings in Plaintiff's Complaint as though they are indistinguishable as to which Defendant they pertain.

Assuming that the Plaintiff did fail to plead distinctly against a single or multiple Defendants the proper remedy would be to dismiss individual Defendants from the complaint. As to this allegation Plaintiff concede that Pleadings in Plaintiff's 1st Amended Complaint are, insufficient as to Emanuel G. Dragone and George Dragone, individually. However, upon analysis of Plaintiff's Complaint Plaintiff argues that each of the four counts brought against

Dragone Classic Motor Cars are plead specifically and with sufficient particularly to give complete clarity to each of the four counts.

Each Count of Plaintiff's Complaint names Dragone Classic Motor Cras or Dragone specifically forming a clear factual basis to create liability for the alleged conduct of Dragone Classic Motor Cars. The causes of action against the Defendant, Dragone Classic Motor Cars, when read in conjunction with all the allegations in the Plaintiff's 1st Amended Complaint are sufficient to meet the legal standard contained in Sanchez v Pereira-Castilla, 590 F.3d 31, 48 (1st Cir. 2009)

### Conclusion

For all of the foregoing reasons, the Plaintiff requests that this Honorable Court deny Defendants' Motion to Dismiss as to lack of personal jurisdiction and improper venue. However, Plaintiff agrees that Defendants 12(b)(6) motion be granted in part and that Emanuel G. Dragone and George Dragone be dismissed as individual Defendants keeping Dragone Classic Motor Cras as the sole Defendant.


Dated: December 8, 2020          /s/ Peter W. Evans_____
                                 Peter W. Evans, Esq., Bar # 6940
                                 Attorney for Plaintiff



PETER W. EVANS ATTORNEY AT LAW
7 Estate Drive
Gorham, ME 04038
(207) 747-5114
inquiry@pevansatlaw.com

CC Frederick Moore, Esq.

**DRAGONE CLASSIC MOTOR CARS**
1797 MAIN STREET, BRIDGEPORT, CT 06604
TEL. (203) 335-4643
FAX (203) 335-9798

**RETAIL PURCHASE ORDER FOR MOTOR VEHICLE**

Date _June 1 0__  Stock No. _____

Salesperson _M D__  Delivered on or About _____

Purchaser's Name _Coburn Benson_

Home Phone _207-793-2800_  Business Phone _____

Address _P.O. Box 540_  City _Limerick_  State _Maine_  Zip _04048_

USED MOTOR VEHICLE _1906_ (YEAR & MAKE) _Locomobile_ (MODEL)  _4_ (CYL)  Body Type _Racecar_  Color _____  Trim _____

Ident. No. _1617_  D.O.B. _____  S.S. No. _____  Driver's License No. _____

FILL OUT THIS SECTION IF USED CAR OR TRUCK IS TO BE TRADED IN AS PART PAYMENT AND DO WARRANT THE TITLE THERETO TO BE FREE AND CLEAR EXCEPT FOR THE UNPAID BALANCE AS SHOWN AND TO THE BEST OF MY KNOWLEDGE. I THE UNDERSIGNED, STATE THAT THE MILEAGE AS SHOWN ON THE ODOMETER THE ACTUAL MILEAGE WHICH THE CAR HAS DRIVEN.

THE MILEAGE AS SHOWN ON THE ODOMETER OF THE MOTOR VEHICLE TO BE PURCHASED IS:

Make & Year _____  Model _____
Used _____

CONSUMER'S WAIVER OF DEFECT, I Accept the particular listed defects on the used motor vehicle being purchased.

Cyl. _____  Body Type _____  Color _____  Title No. _____

Ident. No. _____

Allowance $ _____

_Sale to include all Parts and Automobile related to Car including Patterns and drawings_

Balanced Owed $ _____  Net Allowance $ _____

THERE ARE NO OTHER LISTED DEFECTS _____ (INIT.)

To Whom Owed _____

WRITTEN PROMISES MADE TO CONSUMER
_Complete Restoration to buyers_
_Specification_

**NO INSURANCE IS INCLUDED IN THIS ORDER**

FOLLOWING SERVICE CONTRACT _____

IS IS NOT AVAILABLE AT A COST OF $ _____ ON VEHICLE BEING PUR-

THERE ARE NO OTHER PROMISES MADE TO ME _____ (INIT.)

CHASED FOR _____ MILES OR _____ MONTHS WHICHEVER OCCURS

FIRST. COPY GIVEN PURCHASER. PURCHASED DID NOT PURCHASE

CASH PRICE AT SELLER'S PLACE OF BUSINESS: _2,000,000_

BUYER'S SIGNATURE _____

VIN ETCH SERVICE (OPTIONAL)
YES NO _____ (INIT.)

My Ins. Co. is _____

My Ins. I.D. No. is _____

_1,000,000_  _Deposit_

**TERMS OF WARRANTY**

_500,000_  _June 15 0_

THIS MOTOR VEHICLE IS GUARANTEED FOR _____ DAYS
OR _____ MILES WHICHEVER COMES FIRST. The dealership will pay 100% of the labor and 100% of the parts for the covered systems repair which renders the vehicle mechanically operational and sound during the warranty period. All WORK MUST BE DONE AT THE DEALERSHIP. NO OUTSIDE INVOICE WILL BE HONORED BY THE DEALERSHIP. _____ SIGNATURE

_Balance on Completion_

CASH PRICE _____

SERVICE CONTRACT _____

DEALER CONVEYANCE FEE _no_  _N/A_  $150.00
(THE CONVEYANCE FEE IS NOT PAYABLE TO THE STATE OF CONNECTICUT)

**"AS IS"** THIS VEHICLE IS SOLD "AS IS". THIS MEANS THAT YOU WILL LOSE YOUR IMPLIED WARRANTIES. YOU WILL HAVE TO PAY FOR ANY REPAIRS NEEDED AFTER SALE. IF WE HAVE MADE ANY PROMISES TO YOU, THE LAW SAYS, WE MUST KEEP THEM, EVEN IF WE SELL "AS IS". TO PROTECT YOURSELF, ASK US TO PUT ALL PROMISES INTO _____ SIGNATURE

SALES TAX _Out of State_

REG. | TRANS. | TITLE | LIEN
_____ | _____ | _____ | _None_

**1. TOTAL CASH PRICE DELIVERED** _____

2. DEPOSIT SUBMITTED WITH ORDER _1,000,000_

ADDITIONAL DEPOSIT _500,000 on June 15, 01_

THIS MOTOR VEHICLE BEING PURCHASED IS A PREVIOUS
RENTAL LEASE VEHICLE TAXI POLICE TRADE-IN
AUCTION BUY OTHER

NO REFUND OF DEPOSIT

CASH DOWN PAYMENT AND ALLOWANCES

NET TRADE ALLOW _____

The information you see on the window form for this vehicle is part of this contract. Information on the window form overrides any contrary provisions in the contract of sale. Buyer's Guide Disclosure

CASH ON DELIVERY _500,000 MD_

TOTAL DOWN PAYMENT _____

IF YOU AGREE TO ASSIST ME IN OBTAINING FINANCING FOR ANY PART OF THE PURCHASE PRICE, THIS ORDER SHALL NOT BE BINDING UPON YOU OR ME UNTIL ALL OF THE CREDIT TERMS ARE PRESENTED TO ME IN ACCORDANCE WITH REGULATION "Z" (TRUTH-IN-LENDING) AND ARE ACCEPTED BY ME.

3. UNPAID BALANCE OF CASH PRICE (1-2) _1,000,000.00_

I have read the terms and conditions on the back hereof and agree to them as a part of this order the same as if they were printed above my signature. The front and back hereof comprise the entire agreement affecting this order and no other agreement or understanding of any nature concerning same has been made or entered into. I hereby acknowledge receipt of a copy of this order, and certify that I am of legal age.

**THIS ORDER IS NOT BINDING UNTIL SIGNED AND ACCEPTED BY DEALER**

Purchaser's Signature; and I have received a copy of this order _Coburn B. Benson_  Date _____

Accepted By (Dealer): _____  Authorized Signature _CM_  Date _June 1 01_

REORDER FORM # CS1
Rev. 03/00

**FINAL PAYMENT CASH OR CERTIFIED CHECK**

* AUTO AD SALES, INC. (203) 878-1241
www.autoadsales.com

# USED MOTOR VEHICLE

## ADDITIONAL TERMS OF AGREEMENT

"me", "my" "Consumer" and "Buyer" refer to the Purchaser. "You" "your" and "Dealer" refer to the Seller.

I agree this order is subject to the following terms:

1. understand that: no guarantee should be implied that the vehicle is merchantable or fit for any special purpose you do not assume any liability in connection with the sale; you do not authorize any other person to assume any liability for you. Any verbal promise is void unless it is in writing and signed by a selected person of the dealer and incorporated into the order.

2. In case this order is for a used motor vehicle: I understand that there is no guarantee (unless it is written on the face of this order). The mileage shown on the speedometer is not guaranteed or assumed to be correct. The express warranty on vehicle being purchased will be voided from damages resulting from an automobile accident or from misuse of the used motor vehicle by the consumer.

3. Consumer's warranty period will be extended by any time period during which the used motor vehicle is in the possession of the dealer or his authorized agent for the purpose of repairing the used motor vehicle under the terms and obligations of the express warranty.

4. a. if part of the purchase price is covered by a vehicle to be turned in, I agree to deliver the vehicle to you when I sign this order. If you loan back this vehicle to me (pending delivery) I agree that you may re-appraise the allowance made for the turned in vehicle (as stated on the face of this order) at the time I deliver the trade-in vehicle to you I agree to give you satisfactory proof that I own the vehicle and to sign a mileage certification statement for the trade-in vehicle. I warrant (guarantee) (a) that there are no liens or encumbrances on the trade-in vehicle except as shown on the face of this agreement; (b) that the trade-in does not have a welded or bent frame and that the motor block is not cracked, welded or repaired; (c) that the vehicle has not been flood damaged or declared a total loss for insurance purposes; and (d) that the emission controls have not been removed or tampered with.

**Emissions Control:**

   b. In accordance with Connecticut Public Act 79-238 Motor Vehicle Emissions Sec. 2(a) No person shall fail to maintain in good working order or remove, dismantle or otherwise cause to be inoperative any equipment or feature consituting an operational element of the air pollution control system or mechanism of a motor vehicle required by regulations of the commissioner of environmental protection to be maintained or on the vehicle.

   c. Consumer is responsible for any repairs to emission control system to conform to emissions standards.

5. I agree to accept and pay for the vehicle within five days after I am notified that it is ready for delivery. If part of the purchase price is to be financed, I agree to execute such forms of note and conditional bill of sale which you shall provide. You shall have the right to demand payment of the balance in cash if my credit is not approved.

6. If I do not accept delivery of the vehicle within 5 days, (after I have been notified that it is ready for delivery). I will forfeit any deposit previously made on this order (whether by cash or trade-in vehicle); you may retain such deposit which will then (at your option) constitute liquidated damages for my breach of this contract

7. Buyer shall not be entitled to recover from the selling dealer any consequential damages, damages to property, damages for loss of use, loss of time, loss of profits, or income, or any other incidental damages.

8. This order is not transferable.





# Contact Us

**Contact us by submitting the online form below and a member of our staff will respond to your inquiry as soon as possible. We look forward to hearing from you!**

Or call us at:

Main Office and Restoration: 203-335-4643

Sales: 203-218-1903

Fax: 203-335-9798

## Find us at our Classic Car Center!

5 Connair Road, Orange, CT 06477

Hours:

Monday-Friday: 9:00AM-5:00PM

Saturday: 10:00AM-5:00PM

Sunday: Closed

Your

Name



New Post: Cars and Caffeine Open House!



INVENTORY













MENU



# *OUR TEAM*



## Manny Dragone

President

mannydragone@gmail.com



## George Dragone

Vice President

george@dragoneclassic.com



# Alex Dragone

Executive Vice President

alexdragone1@gmail.com





# *About Us*



Alex Dragone and girlfriend Ashley Delorenzo next to Alex's 1909 Locomobile L Demi Tonneau

One of the oldest existing antique, classic and vintage car dealers in the world, Dragone Classic

Motorcars is recognized as the most knowledgeable and experienced company in the business. Built upon years of buying, selling, restoring and collecting the greatest motorcars in the world beginning with Manny and George Dragone's father, Peter Dragone in the 1940's. Manny and George entered the car scene, starting in the early 1970's starting their own business in 1978 in Bridgeport, Connecticut and were able to befriend and learn from the greatest in the hobby and business such as Henry Austin Clark Jr. and Ben Moser. Very early on Manny and George were some of the very first to have large interest in the unusual exotics such as Bugatti's, Delaheye's, Delages and Talbot Lagos in the U.S. at a time when these cars were not focused on here in the U.S.

This company has seen almost every car imaginable, from incredible brass era and classic era cars to important sports cars of the 1950's and 60's all the way to modern supercars of today. We have also acquired many entire car collections and estates.

We've owned more Delages and Delahayes than anyone else, we've also owned many of the greatest brass cars there are including the famous 1906 Locomobile Grand Prix car "Old 16" as well as many great post war sports cars such as the famous 1957 Ferrari 250 TR serial #0704. We've had thousands of great cars much too many to list.

Today, our mission at Dragone Classic Motorcars is as it has always been, to not only find, restore and provide the collector car world with the greatest cars, but to also educate people about these cars and their history to keep the car hobby alive. We give a personal one on one experience with both buyers and sellers that is unmatched by anyone else and continue to enjoy meeting and

building relationships with collectors, car enthusiast's and specialists all over the world and will do so for many years to come.



First generation Peter Dragone and wife AnnaMae Dragone with their 1907 Model N Ford






MENU

# Index of Blog Posts



New Post: Copper, Brass and Bronze: The 1967 "Exemplar 1" by Coggiola, Torino



New Post: The 1957 Ghia 400 HP Superdart Show Car



New Post: Still Open for Business: Antique Cars are the Greatest Investment



New Post: Fairfield County Region HCCA "Spring Fling" at Boothe Memorial Park



Sold

1906 Pope Hartford Model F



New Post: The Most Original V-16 Cadillac in the World



New Post: 1930 Packard 734 Speedster Runabout Hidden Away for 54 Years!



MENU

# Sell Your Car!

## The Way We Work:

Our buying or consigning program is designed to keep our clients completely comfortable and completely transparent throughout the entire experience. We can sell your car for you where you are kept informed and in control or we can buy your car, motorcycle or entire collection from you for a price that you are comfortable with. Either way, your car or collection will get sold. Email or call us today: (203) 335-4643

● **For our consigners, we charge only 10% commission.**

● **If there is work to be done to your car before it goes up for sale we can discuss what it needs and get it ready to be sold for you at a minimal cost in our** restoration facility.

● **If you don't know what your car is worth, we can give you an accurate evaluation of what we think it can be sold for in today's market.**

●**We want to buy or consign cars in all conditions from completely unrestored barn fresh condition or even partially restored.**

●**We have a large restoration facility to take on any car in any condition.**

> Click Here to Sell Your Car

## The Best and Most Experienced in the Business

Over 50 years of collecting, buying, restoring, and selling many of the worlds most significant motorcars and entire collections with some of the hobby's most significant collectors, and still today with the world's current leading collectors. Even some of the greatest automotive museums have bought and sold cars with us, including the Henry Ford Museum.

We buy entire collections or just individual cars. From famous prewar and postwar European and American racing and sports cars to big classic and brass era road cars and even

prewar and postwar motorcycles, we have had it all. Offering cars to all age groups from one end of the car collecting spectrum to the other. Numerous Pebble Beach award winning and best of show winning cars have been found and sold by us as well.

**This is where the greatest cars have been and come to this day.** Most of the time we sell great cars before we have time to even get them on our website. Others claim to be the best consignment program, but we have sold cars in just a few hours after consigning them. So, if you are wanting to sell your car call or email us and we can accommodate you better than anyone else.

We are looking for great cars to buy, sell or restore!

## Call or Email: (203) 335-4643 • alexdragone1@gmail.com



MENU

# *Restoration*

Our 66,000 square foot facility contains a restoration shop that is unlike any other. We have the talent, knowledge, equipment and most importantly the experience to restore, preserve and maintain brass era cars, classic era cars, pre and postwar European sports cars and many more. We offer the full range of services including machining, wood work, paint and body work, panel making, Upholstery, a large research library, and sales and brokerage services. We perform body off restorations, preservation of unrestored original cars, and seasonal maintenance services. We also offer storage, Concours and rally support as well as rare parts sourcing. Our restoration facility is made up of 30 of the greatest craftsman and technicians sourced from all over the world making sure the work performed on your car is the best there is.





## Restoration and Services Highlights

# *Upholstery*



 

Upholstery can make or break a restoration, so its important to have an interior or convertible top that is made to correct specifications. Our upholsterers have been upholstering great motorcars for over 40 years, and have worked on everything from vintage Ferraris to Packards to Delahayes and Bugattis and muscle cars of the 1960's and hot rods of the 1950's with tuck and roll interiors, our upholsters have done it all. They are also incredibly good at diamond tufting in Brass era motorcars which is very difficult and seldom done properly by other shops.

# *Mechanics*



 

For over 40 years Dragone Classic Motorcars has owned and worked on almost every make and type of car there is including the most exotic and unique cars in the world. Our Mechanical experts and technicians are well seasoned and experienced and can rebuild any engine or give your car the mechanical attention it deserves. Every car and every situation is different, but we are capable of rebuilding your entire engine back to factory specifications and tolerances or fine

tuning your car for high speed vintage racing. We have worked on everything from a simple Ford to twelve cylinder Ferraris to prewar Bugatti's and Alfa Romeos. Our incredible mechanics paired with the talents of the rest of our team takes our services and capabilities to a higher level than anywhere else.

# *Metal Work*



 

Over the life of an old car things get changed, updated and sometimes just plain worn out. This is why having skilled and experienced metal fabricators is a must in a proper restoration shop such as ours. The metal fabrication experts that we have here have been working in our shop in some cases for over 30 years and have endless capabilities in terms of metal fabrication. Many prewar cars are framed in wood, but then skinned in aluminum or sheet metal, many times fenders have been changed or lost etc..and we have the skill and ability to bring these cars back to how they were originally. Our metal fabricators are the best in the world.

# *Machine Work*



 

The ability to create parts that no longer exist is an essential tool in being able to restore exotic collector cars. Our machine shop and machinists are some of the most seasoned, experienced and talented in the world. We have a large assortment of machines including a Pullmax machine, multiple Bridgeport machines etc. Our machine shop is precise and efficient and with their talent and accuracy brings our capabilities and restorations to a higher level than the rest.

# *Body*





Body work is extremely important when restoring a car. Its not just about how straight the car looks, but it needs to be equally as straight under the paint as on the outside. To be considered good bodywork by our standards the metalwork needs to be properly straightened before any paint related bodywork can be completed. We use minimal amounts of body filler in our shop as it is often misused in other shops to make up for the lack of skill to straighten a panel or an entire car without it. Our facility is equipped with a top of the line state of the art downdraft pressurized paint booth which really makes our paint work over the top and keeps our outside surroundings environmentally safe and clean.

# *Woodwork*



 

Wood work is another essential capability for the restoring of great collector cars, especially exotic prewar cars. Many cars of the prewar era have bodies that are framed in wood, both American and European, so having skilled woodworkers with tremendous amounts of experience is a huge asset to our restoration facility. We have a few wood workers that come to us from all over the world, even from previous restoration companies such as the late Phil Hill's restoration shop Hill and Vaughn. Our wood workers are prepared to take on the most complicated and exotic cars in need of wood restoration.

# DRAGONE
Classic Motorcars












MENU



Restoration and Services Highlights









PLAINTIFF'S EXHIBIT
C
2 pages

**From:** Ed Murnane, Esq. <attorneymurnane@gmail.com>
**Sent:** Thursday, November 12, 2020 2:49 PM
**To:** Inquiry <inquiry@pevansatlaw.com>
**Cc:** Frederick C. Moore <fmoore@rkmlegal.com>
**Subject:** Re: Lester Williams

Dear Attorney Evans,

Your client can send you his posts himself.

The fact that you admit in your email that you have no evidence concerning the transaction between Dragone and Benson only confirms that a defendants' motion for Rule 11 sanctions will easily succeed. The fact that you then suggest we should settle the matter based on your lack of evidence smells to me like a strike suit, aka extortion. Your failure to conduct your due diligence is also a basis for a vexatious litigation claim.

The facts of the subject transaction as I understand them and as Dragone is prepared to prove are as follows:

1) The original purchase order for the subject auto was from 6/2001 and would be governed by CT law.

2) Pursuant to the purchase order, Benson paid $1 million as a deposit, which deposit the PO clearly states is non-refundable.

3) On about 6/13/01, Benson paid another $500k toward the purchase and restoration.

4) These payments totaling $1.5 million were the only payments Benson ever made on the subject auto.

5) The $250k wire payment that you reference was for another transaction with Benson, of which there were several between them during that the early 2000s.

6) In 2004, Dragone filed a lawsuit against a machine shop for faulty work related to the Benson restoration. Dragone bore the costs and expenses of the suit. In 2006, Dragone settled the action with the shop. Benson was aware of all this and how the faulty work delayed completion.

7) In October 2008, Dragone informed Benson that the restoration was complete per his original specifications, and Benson came and inspected the subject auto.

8) At that time, Benson stated that he wanted the subject auto to be able to go faster than the original car, and so the parties agreed to additional work to design and construct a new set of gears for the transmission.

9) In November 2008, Dragone estimated the additional work to cost between $160-$200k and take another year to do. Benson agreed. Dragone asked at that time that Benson make a payment toward the $500k still due on the original PO, but Benson made no payments.

10) In February 2010, Dragone informed Benson that the subject auto was complete and that the total amount due was $694,080: $500k plus $194,080 on the gears project.

11) For more than a year, from February 2010 to August 2011, Benson refused to return phone calls to Dragone or to respond to multiple letters and invoices sent to him.

12) On August 16, 2011, Dragone informed Benson that if Dragone did not receive a payment or response within 30 days that the company would be moving the car into inventory and attempting to sell the car to recoup the company's losses.

13) On October 17, 2011, Dragone informed Benson that if he did not contact the company immediately and pay the balance due, that the agreement would be deemed null and void. Benson still did not respond or make a payment.

14) Sometime in 2018, a person (believed to be Williams) began calling Dragone and claiming he was a representative of Benson and asking for details about the transaction. Dragone informed the person to have Benson contact them directly. Shortly thereafter, persons, believed to be Williams and another party, appeared at Dragone's showroom in Bridgeport, CT claiming to be representatives of Benson -- with no evidence to support their claim -- and asked to see the subject auto. Dragone asked them to leave and have Benson contact the company.

15) In 2018, Dragone received communications from an Attorney Anthony Sineni of Maine, claiming he represented Benson concerning the subject auto.

16) In May 2019, Dragone met with Benson, Williams, and their attorney in MA. Benson admitted that he still was not prepared to make good on the unpaid balance. Benson stated that he wished he could race the car before he died. Benson did not claim the subject auto was his or demand delivery even then.

Based on these facts, any breach by Dragone (or Benson) would start no later than about 10/2011. CT has a 6 year statute of limitations on breach of a written contract, 3 years on an oral contract, and 3 years on fraud from the date of the false representation. Hence, any claims by Benson would have to have been brought at the very latest around 10/2017. You commenced the present action in March 2020.

Clearly, Benson never filed a lawsuit before he died because he knew he never had the money owed on the car. Williams knows this as well. Hence, the "opinions" he is posting about the subject auto are deliberately false, intended to defame Dragone, to damage the reputation of the subject auto, and, obviously, to extort money from Dragone by way of a "settlement" -- as you have just attempted.

Purely for the sake of argument, if as you claim, there is still somehow an enforceable contract still existing between Dragone and Benson, then Dragone would certainly be entitled to the monies due, plus statutory interest in CT of up to 10% per annum. At 10%, that equates to $624,672 in interest for the nine years, or a total of $1,318,752 due to Dragone to date and counting, exclusive of costs and fees.

PLAINTIFF'S
EXHIBIT
D
5 pages
exhibitsticker®

**Anthony J. Sineni, III**

| | |
|---|---|
| **From:** | Dragone Classic Motorcars <alexdragone1@gmail.com> |
| **Sent:** | Friday, December 4, 2020 3:57 PM |
| **To:** | Anthony J. Sineni, III |
| **Subject:** | SELL YOUR CAR WITH US! |

View this email in your browser



## CONSIGN YOUR CAR WITH US!



1924 Supercharged Mercedes 24/100/140 Custom Fleetwood Sport Touring



1951 Delahaye 135M Saoutchik Convertible



1930 Packard 734 Speedster Runabout



1912 Fiat Type 55 Fleetwood Roadster

1921 Rolls-Royce Silver Ghost Barker Landaulette

   

Copyright © 2020 Dragone Classic Motorcars, All rights reserved.
Consignment
**Our mailing address is:**
5 Connair Road, Orange, CT, 06477

Want to change how you receive these emails?
You can update your preferences or unsubscribe from this list.